## Frick v. Wirt Company.

*Easements and servitudes—Rights of way—When implied from necessity —Intent of owner of both servient and dominant property.*

1. Where an apparent, permanent, continuous and necessary servitude is either imposed by the owner or continued by him upon one part of his property for the benefit of another part, the purchaser of the servient property at either private or judicial sale or by partition under judicial proceedings, in the absence of an express reservation on the subject, takes the property subject to the servitude so imposed or continued by the original owner.

2. The question of the intended permanency of an easement is to be determined, in the absence of express contract, by reference to the nature and relation of the arrangement of the properties affected by its use; the acts of the parties characteristic of them are persuasive evidence.

3. The actual intention of the owner in making or continuing the arrangement is not necessarily controlling, and the fact that he intended it to be only temporary will not prevent a right to its permanent use from passing with the grant by implication without express reservation, if at the time of the grant it was apparent, with nothing to indicate that it was not intended to be permanent.

4. The distinction between continuous and discontinuous easements or servitudes, in a strict sense of those terms, has not been adopted in Pennsylvania.

5. A right of way which is indicated clearly by the physical condition of the alley over which it is exercised is continuous, as that term is understood in Pennsylvania.

6. In Pennsylvania, the necessity required to pass an easement by implication is a reasonable, not an absolute, one. The right or privilege should be necessary or essential to the proper enjoyment of the estate granted, and should not be for a temporary convenience or for mere pleasure.

7. If the easement be permanent, continuous and necessary, the shifting of the dividing line of the dominant and servient properties by a decree in partition and under deeds pursuant thereto, so that an alley over which the right of way is to be exercised was placed almost entirely over land of the dominant property, does not affect the easement or servitude where the physical location of the alley was not altered, so that, to all outward appearances, the servitude remained.

8. All deeds in the line of title, from 1819 to 1880, to the two lots in question contained the recital that a certain ten-foot wide alley or driveway was laid out or constructed to the depth of sixty feet along the northerly side of the southernmost lot, and that owners, tenants or occupiers of each messuage and lot were granted free ingress, egress and regress along the alley in question. From 1889 to 1894 the properties were held in common ownership. In the latter year this was terminated by a final decree in partition in the Orphans' Court and deeds in pursuance thereof. Neither the decree nor the deeds made any mention of the alley. Through various conveyances the plaintiff became the owner of one property and the defendant of the other. The latter built gates across the alley, which he locked, thus preventing the former from using it. The plaintiff thereupon filed this bill, praying for a mandatory injunction for the removal of the gates, etc. The trial judge found that from 1870 to the present time the only practicable entrance and exit for the rear tenements was by the alley; that it had been in continuous use for that purpose; and that this use had never been interrupted until the gates were constructed. During the unity of the title in the tenants in common, preceding the partition, the nature, arrangement and use of the estate, relation of the parts, existing degree of necessity, and the marks on or about the alley, the arrangement of the buildings thereon, the entrance and exits therefrom, the nature or character of the road or bed of the alley and the uses to which it was put were so notorious, plainly visible, permanent, necessary and continuous that it reasonably appeared that the owners of the estate were desirous of the preservation of the servitudes and easements for the fair enjoyment of the several parcels: *Held*, that the unity of possession and title of the two parcels by the tenants in common did not extinguish the easement of the ten-foot wide alley and that it passed to the plaintiff, although not mentioned in the decree in partition or the deed in pursuance thereof under which he claimed.

Bill, answer, replication and proofs. C. P. No. 5, Phila. Co., June T., 1920, No. 2224, in Equity.

Frick *v.* Wirt Company.

*Henry W. Scarborough*, for plaintiff.

*J. E. Wilkinson* (of *Conlen, Brinton & Acker*), for defendant.

MONAGHAN, J., Oct. 25, 1922.—The plaintiff, Charles E. Frick, filed his bill in equity on June 23, 1920, against the defendant, Wirt Company, for the purpose of enjoining the latter from obstructing the use of a certain alley between the premises Nos. 5230-32 and Nos. 5234-36 Germantown Avenue, in the City of Philadelphia. The defendant filed its answer; a replication was duly filed, and the cause was heard on bill, answer, replication and proofs.

### Findings of fact.

1. In 1819, the title to the two parcels of land now owned, the northerly one, Nos. 5234-36 Germantown Avenue, by the plaintiff, Charles E. Frick, and the southerly and adjoining property, Nos. 5230-32 Germantown Avenue, now owned by the Wirt Company, the defendant, was in the assignees of Christopher Van Lashet. By divers deeds of conveyance the title to the southerly parcel became vested in fee in Henry C. Woltemate in the year 1864; the title to the northerly parcel, by sundry deeds of conveyance, became vested in his wife, Rosalie Woltemate, in fee, in 1880. Henry C. Woltemate died seized of his portion of the property in 1871, leaving a will. Rosalie Woltemate died, testate, Feb. 22, 1889, seized of her portion of the property. All the deeds in the line of title to each lot, from 1819 to 1880, including the ultimate separate conveyances to Henry C. Woltemate in 1864 and to Rosalie Woltemate in 1880, contained a recital that a certain ten feet wide alley or driveway was laid out or constructed to the depth of sixty feet along the northerly side of the southernmost lot; further, by the express language in all of the deeds of conveyance for each of the lots, during that period, the owners, tenants and occupiers of each "messuage and lot" are granted the "free ingress, egress and regress into, out of and along" the said alley "with or without horses, cattle, carts and carriages in common with the owners, tenants and occupiers of the messuage and lot adjoining, at all times hereafter forever, and a watercourse over and along the same, reserving the right, however, of building over and making arches under the said alley, &c."

2. From 1819 until the death of Rosalie Woltemate, Feb. 22, 1889, the title to the two parcels was in separate owners. Upon her death, in accordance with the terms of her will and the will of her husband, the title to the two parcels became vested in fee in her three sons, Henry C., Albert C. and William Woltemate, as tenants in common. William Woltemate died in 1891, intestate, leaving a sole heir, Esther Woltemate, who thus became a tenant in common with her uncles, Henry C. and Albert C. Woltemate.

It appears from an examination of all deeds of conveyance to this time that the alley was laid over one and a-quarter feet of the southern lot, and over eight and three-quarters feet of the northern lot.

3. The tenancy in common of the entire tract continued from Feb. 22, 1889, until July 31, 1894, when it was terminated by a final decree in partition proceedings in the Orphans' Court of Philadelphia County. The decree made no mention of the alley. Following the decree, the northern parcel was conveyed to Esther Woltemate, the southern parcel to Albert C. Woltemate. These deeds did not mention the alley.

4. By the decree and the conveyances in pursuance thereof, the division line of the adjoining properties was changed, so that the line of the southern parcel was advanced about nine feet on the land which constituted the bed of what is known as the alley, instead of one and a-quarter feet, as theretofore;

2 D. & C.

Frick v. Wirt Company.

and the line of the northern parcel was set back, so that nine inches in front, tapering off to six inches in the rear, laid in the alley, instead of eight and three-quarters feet, as theretofore.

5. Esther Woltemate conveyed her property to the plaintiff, Charles E. Frick, April 23, 1920. The deed by specific language granted to him the use of the ten feet wide alley as a watercourse and as a means of ingress, egress and regress, the recital being as follows:

". . . With the right and privilege of a certain ten feet wide alley over and along the northwesterly side of the lot adjoining to the southeast, now owned by Wirt Company and formerly of Albert Woltemate, extending from said Germantown Avenue southwestward the length of sixty feet, with free ingress, egress and regress into, out of and along the same, with or without horses, cattle, carts and carriages, in common with the owners, tenants and occupiers of the said adjoining lot of the said Wirt Company, forever, and also the right and privilege of a watercourse over and along the said alley. . . ."

6. Albert C. Woltemate mortgaged his property, July 31, 1894, to the Mutual Fire Insurance Company for $7000. On Sept. 23, 1918, this property was sold by the sheriff to the mortgagee, which, on March 8, 1919, conveyed the premises to the defendant, Wirt Company. No mention of the alley was made in either the mortgage or the sheriff's deed, or in the deed to the Wirt Company.

7. In December, 1919, the Wirt Company swung across the Germantown Avenue entrance to the so-called alley two gates, affixed to posts; one post the defendant erected entirely on the plaintiff's land, the other on its own land; both were within the bed of the alley.

On April 1, 1920, the defendant locked said gates, thus obstructing the tenants of the plaintiff in the use of the alley. Whereupon the plaintiff filed his bill in equity, praying for a mandatory injunction for the removal of the gates, posts, fastenings and locks, &c.

8. From 1870, and for a long time prior thereto and to the present time, stone buildings have stood on the land along the northerly side of said alley. These buildings consisted of one fronting twenty-eight feet three inches on Germantown Avenue (known as Nos. 5234-36) and extending in depth along the northerly side of the alley about twenty-two feet. It is a two-story and attic house. The front showed two stories and had two doorways opening on the avenue. The side of the house on the alley showed two stories and an attic. From the first floor of this side a doorway opened directly on the alley. There also appeared a cellar window, one window on the first story and two windows each on the second story and the third story, all overlooking the alley. In front of the doorway on this side of the house a marble step on brick foundation rested on the bed of the alley.

Immediately to the rear, adjoining and extending back from the front house, there is and was, at least since 1870, a two-story stone tenement, about forty-two feet in length or depth and about twelve feet in width, set back along its entire depth on a raised plateau at a distance of about fifteen or sixteen feet from the northerly side of the alley, leaving an open space, mentioned in the testimony as the plateau, about fifteen or sixteen feet in width and about forty-two feet in length, bounded by the southerly line of the rear tenement, the westerly line of the front house and the northerly line of the alley.

On each end of the side of the plateau, in front thereof and resting in the bed of the alley, were two marble slabs or steps. The surface of the plateau

was about sixteen inches above the level of the bed of the alley. These steps were in the alley from —————— to ————. The rear tenement had two doorways facing the alley and opening on the plateau.

Since 1893, and probably before, for some years, there were buildings along the southerly side of the alley, which were used by the Woltemates in the florist business. The precise character and dimensions of these buildings did not appear in the testimony.

9. Prior to 1894, the bed of the alley consisted of a dirt road, over and along which the surface and roof-waters of the rear tenements, as well as the wash-water of the tenants, drained towards the front to Germantown Avenue.

10. Sometime in 1894, Albert C. Woltemate paved the entire width and length of the alley, for nearly sixty feet, with vitrified brick. On each side of the brick pavement the brick was depressed, forming what are apparently gutters, leading from the rear to the front of the property.

In paving the alley, Albert C. Woltemate, among other things, placed the vitrified brick up to and around the brick foundation on which rested the step leading from the doorway opening from the front house on to the alley.

11. The physical location of the alley and the arrangement of all the buildings, with the various approaches, entrances and windows, have remained precisely the same from 1870 until the present time. The bed of the alley has remained the same, except that in 1894 it was paved with vitrified brick. The drainage down the alley continued to be the same, except that in recent years underground drainage was installed.

12. During the period from 1870 until the present time the rear stone house was always occupied by one and sometimes two families; the house in front was also, during the same period, occupied by one and sometimes two tenants. A room at the southeasterly side of the first floor of the front building had been walled off from the rest of the house. This room was usually occupied by a shopkeeper or tradesman, who had access to this shop only through one of the doorways leading to Germantown Avenue. The persons occupying the remainder of the front house had access to their portion by the doorway leading from Germantown Avenue and also through the doorway opening on the alley.

13. During the period from 1870 to the present time the only practicable entrance and exit for the rear tenements was by the alley. All that time the various tenants of both the rear and the front buildings used the alley as a passageway. The shopkeepers in the front house used the alley for obtaining water from the hydrant located in front of the rear tenement. The furniture of tenants moving in and out of the rear tenements was transported by teams using the alley. It was the only way for that purpose. Fuel and food supplies were also delivered to the tenants of the rear in the same manner.

14. Long prior to the vesting of the title in Henry C., Albert C. and William Woltemate, on Feb. 22, 1889, the owners, tenants and occupiers of each of the parcels of land used the alley in accordance with the terms of the express privilege in the deeds to each portion. During the time the title was united in the three tenants in common, from Feb. 22, 1889, to July, 1894, the arrangement of the properties along the alley continued the same; the tenants occupying the northern houses used the alley without objection from any of the co-owners, the same as it had always been used. The tenants in common in whom was vested the unity of title for five years, instead of making a new disposition of the respective parcels, or extinguishing the easements and servitudes of the alley existing theretofore, continued during that period the conditions and uses of the alley in substantially the same manner as before

2 D. & C.

they had acquired their title, and substantially in accordance with the express grants contained in the deeds of conveyance from 1819 to that time.

15. During the unity of title of the three tenants in common, the nature, arrangement and use of the estate, the relation of the parts, the existing degree of necessity and the marks on or about the alley, the arrangement of the buildings thereon, the entrance and exits therefrom, the nature and character of the road or bed of the alley, and the uses to which it was put, were so notorious, plainly visible, permanent, necessary and continuous that it reasonably appeared that the owners of the estate were desirous of the preservation of the servitudes and easements for the fair enjoyment of the several parcels.

## Discussion.

Did the unity of title and possession of the two parcels in the tenants in common have the effect of extinguishing the easement of the ten-foot wide alley, which admittedly until that time was in existence under the express grants in the deeds of conveyance to each parcel?

One of the essential features of an easement is that it is a right or interest in the land of another; a man cannot have an easement in his own property. While this is true, it has been held that the owner of an entire tract of land, or of two or more adjoining parcels, may so employ a part thereof as to create a seeming servitude, or, as it is sometimes termed, a quasi-easement, in favor of another portion to which the use becomes appurtenant. When the quasi-dominant tenement is then conveyed without an express reference in the deed to the servitude, the quasi-easement is, or is not, held to have been impliedly granted, depending upon the nature or character of the use imposed upon the quasi-servient tenement, by invoking the presumption that the parties contracted with reference to the conditions at the time of the sale, and that the grantor intended to convey a right to use the easement and that the grantee reasonably expected to take and hold such right. This doctrine of the creation of easements by implication rests upon the exceptions to the rule that written instruments shall speak for themselves. It was originally restricted to ways of necessity, which were implied upon a conveyance of land having no means of ingress and egress, because it was for the public good that the land should not be unoccupied. But it has been broadly extended to include existing servitudes or quasi-easements. See 9 Ruling Case Law, 754.

". . . It is obvious . . . that if the dominant and servient tenements become the property of the same owner, the exercise of the right, which in other cases would be the subject of an easement, is, during the continuance of his ownership, one of the ordinary rights of property only, which he may vary or determine at pleasure. The inferior right of easement is merged in the higher title of ownership: 2 Bing., 76; 9 Moore, 166; 3 Bulst., 339. In the common law it is said to be extinguished by unity of title. In the civil law it is lost by 'confusion.' But under both systems it is nothing but the *name* that is gone. The *right* remains, as before, under a highter title; and upon a subsequent severance of the estate, by alienation of part of it, the alienee becomes entitled to all continuous and apparent easements which have been used by the owner during the unity of the estate, and without which the enjoyment of the several portions could not be fully had; for no man can derogate from his own grant:" Kieffer v. Imhoff, 26 Pa. 438. So, in Pennsylvania, the general rule is that when, during the unity of title, an apparently permanent and obvious servitude is continued or is imposed by the owner of an entire tract upon one part of his estate, or of several parcels, in favor of another, and which at the time of the severance is in use and is reasonably necessary for

the enjoyment of the other, then, upon a severance of such ownership, there arises by implication of law a right in the grantee to continue such use: Seibert v. Levan, 8 Pa. 383; Phillips v. Phillips, 48 Pa. 178; Zell's Executors v. Universalist Society, 119 Pa. 390; Geible v. Smith, 146 Pa. 276; Grace M. E. Church v. Dobbins, 153 Pa. 294; Liquid Carbonic Co. v. Wallace, 219 Pa. 457; notes, 26 L. R. A. (N. S.) 315; 9 Ruling Case Law, 755. And where a continuous and apparent easement is either imposed by the owner or continued by him on one part of his estate for the benefit of another part, the purchaser of one of the portions at either private or judicial sale, or by partition under judicial proceedings, in the absence of an express reservation on the subject, takes the property subject to the easement or servitude: Kieffer v. Imhoff, 26 Pa. 438; Cannon v. Boyd, 73 Pa. 179; Seibert v. Levan, 8 Pa. 383; Overdeer's Administrator v. Updegraf, 60 Pa. 110; Zell's Executors v. Universalist Society, 119 Pa. 320, 402.

If, at the time of the severance of the unity of title by the decree in partition, and the conveyance of the severed parcels to Albert C. Woltemate and Esther Woltemate, respectively, there had been such a use of the alley as gave rise to the *right* of easement, so long continued and so obvious as to show it was meant to be permanent; that the right of easement was reasonably necessary to the beneficial enjoyment of the land granted; that the servitude was continuous, then, upon the passage of the severed title to Albert and Esther, respectively, there was an implication of a grant of the easement and the burden of the servitude on each parcel, notwithstanding the absence of any mention of the alley, the easement or the servitude, in their respective deeds: 9 Ruling Case Law, 754.

In order that the right to any quasi-easement in existence during the unity of title may pass to Esther or Albert, respectively, depends upon whether it was at the time of the severance of title (1) permanent; (2) continuous; (3) necessary.

1. The doctrine relating to easements by implication should not be understood as applying to any temporary convenience adopted by the owner. The nature, arrangement and use of the estate, the relation of the parts, the existing degree of necessity, the marks on or about the alley, the arrangement of the buildings thereon, the entrances and exits therefrom, the nature and character of the road or bed of the alley, should be considered in determining whether the uses of the alley are permanent or are mere temporary conveniences. If an observation of any or all of the various conditions suggested show that it or they are notorious, so plainly visible that it reasonably appears that the owners of the estate were desirous of the preservation of the servitudes or easements for the fair enjoyment of the different parcels, the quasi-easement should be held to be òf a permanent character.

The question of intended permanency is to be determined, in the absence of express contract, by reference to the nature and relation of the arrangement of the properties affected by its use; the acts of the parties characteristic of them are persuasive evidence: Note, 26 L. R. A. (N. S.) 364.

The actual intention of the owner in making or continuing the arrangement is not necessarily controlling. The fact that he intended it to be only temporary will not prevent a right to its permanent use from passing with the grant, by implication without express reservation, if at the time of the grant it was apparent, with nothing to indicate that it was not intended to be permanent. In *Liquid Carbonic Co. v. Wallace*, 219 Pa. 459, the court said: "The argument of the appellant rests mainly on the view that the road, having had its origin in the temporary convenience of the owner of the larger

2 D. & C.

lot, was never intended to be permanent, and that the intention was an essential element in the creation of a servitude. The principle in general may be conceded, and so long as the ownership of the dominant and servient land remains in the same party, the application of the principle may be determined by his actual personal intent. But, on a severance, a question of conflicting rights arises, and the intent which lies at the basis of the creation of the servitude is no longer the grantor's actual and perhaps undisclosed intent, but the mutual intent of the parties as gathered from their acts and the circumstances, as well as from their own words. The principle was well expressed in Hopewell Mills v. Savings Bank, 150 Mass. 519: 'The intention to be sought is not the undisclosed purpose of the actor, but the intention implied and manifested by his act. It is an intention which settles, not merely his own rights, but the rights of others who have or may acquire interests in the property. They cannot know his secret purpose, and their rights depend, not upon that, but upon the inferences to be drawn by what is external and visible.' "

While the tenants in common were in possession by unity of title, the road or drive in the alley was plainly visible; the drainage system of both parcels was apparent. It was obvious at all times that the roof and surface-waters from the rear of the lots, as well as the wash-water of the tenants of the rear tenements on the northern lot, were and could not well be otherwise drained except through the alley. The doorways opening directly on the alley, the steps in front of them, the cellar windows and other windows opening immediately on the alley, were permanent conditions, all plainly visible and highly significant of the uses of the alley. The continued and permanet occupation of the properties on the northern parcel was known to the owners, tenants and occupiers of both parcels, and it was manifest that the only practicable and reasonably convenient passage for the tenants in the rear was the alley, which was continuously used by them for ingress and regress to and from their homes.

We are of opinion that the quasi-easements and servitudes during the entire period of the unity of title of the tenants in common were permanent, and that the uses of the alley, now claimed by the plaintiff, were intended by the co-owners to be preserved for the benefit of each parcel.

2. Was the quasi-easement of the alley "continuous?" The term "continuous," qualifying the words "easement" or "servitude," in the opinions of our courts of appeal on the subject now discussed, is not used in the commonly accepted meaning of the term. The courts of the common law, borrowing the terms from the Code of France, recognize, *inter alia*, the classification of servitudes into continuous and discontinuous, in defining which, a text writer says: "Continuous are those of which the enjoyment is or may be continual without the necessity of any actual interference by man—as a water-spout or a right of light or air. Discontinuous are those the enjoyment of which can be had only by the interference of man—as rights of way or a right to draw water:" German Savings and Loan Co. v. Gordon, 102 Pac. Repr. 736; 26 L. R. A. (N. S.) 331. An examination of the cases, notably Phillips v. Phillips, 48 Pa. 178, and Liquid Carbonic Co. v. Wallace, 219 Pa. 457, and our other cases of the same nature, will show that the word "continuous," as applied to a quasi-easement or servitude, has been used by the court to qualify an easement which was discontinuous. The distinction between "continuous" and "discontinuous" easements or servitudes is, in any event, somewhat arbitrary and has not been adopted in this State, as an examination of the typical cases will demonstrate: Phillips v. Phillips, 48 Pa. 178, and Liquid Carbonic Co. v. Wallace, 219 Pa. 457.

Frick *v.* Wirt Company.

A discontinuous quasi-easement, when evidenced in a substantial manner, ought to pass by implied grant as an appurtenant to the dominant tenement, when the latter is severed by a conveyance thereof. The reason for this deduction is ably stated by the court in Phillips *v.* Phillips, 48 Pa. 178, as follows: "It may be granted that the continuance of drains, water-pipes and mill-races may more distinctly indicate their permanent and essential nature than a mere private way; but when the permanency of the way is proved, confessed or not disputed, the difference vanishes; they stand on the same footing."

We are convinced from the facts in the present case that, even though the quasi-easement of the alley was not in the strict or technical sense of the term "continuous," and though it was "discontinuous," since it has been substantially evidenced, it would fall within the application of the word "continuous" as employed in the decisions of our courts.

3. It is now generally recognized that it is essential to the creation of an easement by implication, on the severance of an estate, that the easement shall be necessary and not merely convenient to the beneficial enjoyment of the dominant portion. There is a conflict of authority with regard to the degree of necessity required. In some jurisdictions easements will be implied only when the necessity for them is strict; while in others, including our own State, the prevailing rule is that the necessity required to pass an easement by implication is a reasonable, not an absolute, one. The right or privilege should be necessary or essential to the proper enjoyment of the estate granted, and should not be for a temporary convenience or for mere pleasure..

We are satisfied from the facts of this case that there was a reasonable necessity for the creation and continuance of the uses of the alley.

The testimony shows that, at the time of the severance of the unity of title, the quasi-easements and servitudes, for the benefit and to the burden of which the two parcels of land were then subject, were permanent, continuous and necessary within the meaning of those terms under our decisions. By implication of law, the easements and servitudes passed as appurtenant to each parcel, without express grant or reservation in the decree of partition, or in the deeds delivered in pursuance thereof, to Albert C. Woltemate and Esther Woltemate; and the alley being thus appurtenant to each parcel, the owners, tenants and occupiers of each had a right to the use of the same.

The defendant contends, however, that, conceding the quasi-easements and servitudes existed at the time of the severance of title and that they were permanent, continuous and necessary, nevertheless, for the reason that in the decree in partition, and in the deeds in pursuance thereof, the dividing line of the two parcels was so shifted that the alley was placed almost entirely over the defendant's land, no easements or servitudes could be held to have been created or reserved by implication of law, and that the quasi-easements and servitudes existing during the unity of title were extinguished.

The shifting of the line did not disturb the physical location of the alley; to all outward appearances the marks of the burden were open and visible to any ordinary observer, and patent as a feature of the parcels of land upon such examination as would be ordinarily given. The easements and servitudes were not merely as to any particular portion of either parcel, but were appurtenant to the whole of each. In the absence of an express provision in the decree of partition, or in the deeds delivered in pursuance thereof, the rights of easement and the burdens of servitude passed by implication of law as appurtenant to the parcels conveyed to Albert and Esther Woltemate.

2 D. & C.

Frick v. Wirt Company.

### Conclusions of law.

1. The alley, nine feet three inches in width on the Germantown Avenue front and extending sixty feet to the rear, being ten feet in width at the rear, as shown on the plan hereto attached, is an appurtenance of Nos. 5234-36 Germantown Avenue.

2. The plaintiff, the tenants and occupiers of Nos. 5234-36 Germantown Avenue, and the defendant, the tenants and occupiers of Nos. 5230-32 Germantown Avenue, have the right to use said alley as a watercourse and as a means of ingress, egress and regress to and from Germantown Avenue, with or without horses, cattle, carts and carriages, in common with each other.

3. The defendant, its officers, employees, agents and all others acting under it, them or any of them, should be enjoined from maintaining the gates across said alley and from locking said gates or otherwise obstructing said alley, and from in anywise hindering or obstructing the plaintiff and the tenants and occupiers of his property from using and enjoying full rights in and to said alley.

4. The defendant should be ordered to remove the gates, posts, fastenings and locks thereon.

5. The defendant to pay the costs.

Counsel to prepare and present a form of decree.

### Final decree.

This cause came on to be heard at this term and was argued by counsel, and, upon consideration thereof, it is this 25th day of October, 1922, ordered, adjudged and decreed as follows, viz.:

That the defendant, the Wirt Company, its officers, employees, agents and all others acting under it, them or any of them, be and they and each of them are hereby perpetually restrained and enjoined from maintaining gates across the alley located between the plaintiff's buildings, known as Nos. 5234-36 Germantown Avenue, Philadelphia, and the defendant's buildings, known as Nos. 5230-32 Germantown Avenue, Philadelphia, and from locking the said gates or otherwise obstructing the said alley, and from in anywise hindering or obstructing the plaintiff and the tenants and occupiers of his property from using and enjoying full rights in and to the said alley.

That the Wirt Company be and it is hereby ordered and directed to remove the gates which it has heretofore been maintaining across the said alley, and also to remove the posts, fastenings and locks connected with the said gates.

It is further ordered, directed and decreed that the costs of this proceeding shall be paid by the Wirt Company.