## Keller et al. v. Reichl et ux.

*Edwin K. Kline, Jr.*, for plaintiffs.
*D. M. Garrahan*, for defendants.

HENNINGER, J., May 8, 1944.—Plaintiffs filed a bill in equity to the above term and number averring that they are the owners of two respective tracts served as dominant tenements with water originating on defendants' property as servient tenement and piped to their properties, an arrangement made by former tenants in common of the three tracts, whose assignee and trustee in bankruptcy respectively sold in three separate transactions to the three parties or to their predecessors in

title; that defendants, knowing of the existence of an easement, diverted the water from the pipe line and that plaintiffs are irreparably damaged and seek injunctive relief. Defendants answered denying knowledge or means of knowledge or the existence of any easement.

A hearing was held in support of said bill and answer, and from admissions in the pleadings and from said testimony the chancellor makes the following

### Findings of fact

1. Plaintiffs and defendants are the respective owners of three tracts of land located in the Township of South Whitehall, Lehigh County, Pa., one tract being owned by Paul D. N. Keller et ux., the second by Edwin Connors et ux., and the third by Charles Reichl et ux.

2. The said tracts adjoin and abut each other.

3. Charles O. Hunsicker obtained title to the Keller tract by deed of Mary C. Laubach et vir., dated May 29, 1912, and obtained title to defendants' tract by deed of Morris Mangold et ux., dated March 10, 1916, and on December 28, 1920, conveyed an undivided two-thirds interest in said tract to Herbert J. Hunsicker and James F. Hunsicker. James F. Hunsicker obtained title to the Connors tract by deed of Minnie M. Sauerwine et vir., dated March 19, 1920, and on April 21, 1926, James F. Hunsicker died leaving a will wherein he devised all of his real estate to his sons, Charles O. Hunsicker and Herbert J. Hunsicker.

4. On April 21, 1926, Charles O. Hunsicker and Herbert J. Hunsicker were the owners of the three tracts involved in this matter.

5. On August 18, 1941, Herbert J. Hunsicker conveyed his one-half interest in said tracts to the Allentown National Bank.

6. On August 22, 1941, Charles O. Hunsicker was adjudicated a bankrupt and thereafter Joseph B. Walker was elected trustee of his estate.

7. The tract owned by Edwin Connors et ux. was conveyed by the said Joseph B. Walker, trustee, and the Allentown National Bank to Earl V. Schantz and Louis M. Schantz, by deed dated March 12, 1942, who thereafter conveyed the same to J. Frank Meyers et al., and they in turn, by deed dated October 3, 1942, conveyed said tract to plaintiffs Edwin Connors et ux.

8. The tract owned by Paul D. N. Keller et ux. was conveyed to them by the said Joseph B. Walker, trustee, and the Allentown National Bank by deed dated May 18, 1942.

9. The tracts owned by defendants were conveyed by the said Joseph B. Walker, trustee, and the Allentown National Bank to Edward H. Haberman et ux., by deed dated March 30, 1942, who, by deed dated June 2, 1943, conveyed the same unto said defendants.

10. The deeds of said trustee in bankruptcy and the Allentown National Bank set forth that said sales were made "free and clear of all taxes, mortgages, liens, judgments and encumbrances", and the orders of the referee in bankruptcy authorizing said sales contain the same provision.

11. The deeds given by the trustee in bankruptcy and the Allentown National Bank contain special warranties and not general warranties.

12. The springs are located upon defendants' property, referred to as the upper and lower springs.

13. Sometime between January 1, 1917, and July 1926, the Hunsickers connected said two springs by pipelines and enclosed the lower of the two with a cement retaining wall and at the same time installed a pipeline from said lower spring to the Connors tract and thence to the Keller tract.

14. A springhouse was erected over the upper spring.

15. The outlet pipe from the upper spring and the inlet pipe to the lower spring were covered with several

feet of ground but the pipes were visible where they led out of the upper spring and into the lower spring.

16. In the lower spring there were two outlet pipes visible upon inspection. The one led to defendants' home, while the other was the intake to the pipe line leading to plaintiffs' homes.

17. The pipe line itself from defendants' lower spring to defendants' homes was placed 30 inches underground and was completely covered with ground and vegetation. The outlet of this pipe on the Connors property is also underground.

18. From the date of the installation of said pipes the springs on defendants' property supplied the properties of plaintiffs with water, continuously and without interruption until July 1943.

19. In July 1943, defendants, their agents or employes, removed the springhouse from the upper spring, plugged the outlet pipe leading from the upper spring to the lower spring, and drained the water from the upper spring away from the pipe leading to the lower spring by a ditch so that the same flowed in a northward direction.

20. The above actions by defendants, their agents or employes, caused the water in the lower spring to drop to such a level that neither of the plaintiffs was supplied with water.

21. In August 1943, the upper spring continued to flow through said ditch but the pipe leading from the upper spring to the lower spring remained plugged.

22. Many persons knew of the existence of said pipe line, but there is no evidence that its existence was brought to the attention of either defendants or their predecessor in title prior to their obtaining title to the upper property.

23. The installation of said pipes by the common owners was of a permanent character and not made for the particular convenience of the common owners.

24. In July 1943, the properties of plaintiffs had no other ready source of water supply than the water supplied by defendants' property.

25. The system of pipes by which defendants' property supplied plaintiffs' properties with water was continuous and self-acting; it was a gravity system requiring no mechanical or physical assistance and flowed continuously as set forth above.

26. Plaintiff Connors has a well which, with a pump, now supplies the water to his house on the Connors tract.

27. Plaintiff Keller also has a well on his property which, with a pump, is now supplying water to the Keller tract.

## Discussion

Our problem is the troublesome one of easements by implication. Courts have held that to be effective at least four elements must be present, that is to say, there must be: (1) Severance of title; (2) use so long continued and so obvious and manifest as to show that it was meant to be permanent; (3) necessity to the beneficial use of that property whose owner claims the easement; and (4) a servitude continuous and self-acting, rather than occasional: Becker v. Rittenhouse, 297 Pa. 317, 325.

Plaintiffs' case establishes beyond any doubt all but one of these elements. The sale by the bank and referee in bankruptcy brought about a severance of the title. The use was continued for about thirty years; the pipes were firmly laid below the frost line; the springs were covered and walled in for protection, showing a permanent plan and not a device for mere ephemeral convenience. The existence of other possible means of supplying water to the lower properties does not contradict the necessity, as necessity is defined in easements by implication. A plaintiff is not required to show that the continuance of the easement is indispensable to continued use of his property. It is enough to show that it

is necessary to the convenient enjoyment thereof: Koons v. McNamee, 6 Pa. Superior Ct. 445, 449; Heffley v. Lohr, 149 Pa. Superior Ct. 586, 591; Phillips v. Phillips, 48 Pa. 178. That the enjoyment of the easement depends upon the use of a pipe line or other instrumentality that may cease to operate does not defeat the easement: Philadelphia Steel Abrasive Co. v. Louis J. Gedicke Sons, 343 Pa. 524, 528.

The weak point in plaintiffs' case is the notoriety or obviousness of the easement. There was no proof of notoriety, although former tenants of parts of the properties involved knew of its existence. Defendants' predecessor in title, who apparently permitted the water to flow during his ownership of defendants' property from March 30, 1942, to June 2, 1943, was not called by either party to show his knowledge of the existence of the easement or his communication of that knowledge to defendants. The nearest plaintiffs came to showing knowledge in defendants was a conversation with Charles Reichl after he had obtained his deed and before he took possession. So far as we can ascertain the sole visible evidence of the existence of the easement on defendants' property was the presence of two outlets from the lower spring, and plaintiffs argue that this put defendants upon notice that the spring served other properties than his own. Defendant Charles Reichl—his wife was prevented from appearing due to hospitalization—denied knowledge of the second outlet until diversion of the water from the lower spring exposed the outlet pipes, and denies knowledge of the existence of the servitude.

Plaintiffs rely upon cases that hold that where an inspection of the property would have put a prospective owner upon notice of a probable easement he is bound by what he could have discovered. There is no part of the set-up of the springs that would be inconsistent with their use for defendants' property alone. Nor can we

say that a prospective purchaser is either bound to look into a spring to see how many pipes lead from it or to assume from the presence of two outlets that the spring must be serving a neighbor as well as his own property.

None of the cases cited by plaintiffs approaches this one in the paucity of notice. The closest case is Anania et al. v. Serenta, 275 Pa. 474, where it was held, however not only that the servitude of a reservoir to a hotel property was notorious but that the purchaser had actual knowledge prior to his purchase. In Heffley v. Lohr, supra, the dispute was between different members of the same family, all of whom had been familiar with the arrangements in use for years. In Eshleman v. Parkesburg Iron Co., 235 Pa. 439, the court remarked that a dam, intake, and diversion were open, plain, and visible to every passerby and actually known to plaintiff therein. In Koons v. McNamee, supra, which was the case of a drain, besides a finding that an inspection of the premises would disclose its existence, the court found that defendant there had actual knowledge of its existence. Seibert v. Levan, 8 Pa. 383, treats of a mill race, which, of course, is obvious and totally unlike this watercourse, the only visible part of which was under some inches of water and even then had no distinguishing marks or characteristics to differentiate it from an outlet to defendants' house or barn.

Our finding that the servitude which plaintiffs claim to have ripened into an easement by implication was neither obvious, notorious, nor actually known by defendants to be in existence relieves us of any necessity to pass upon defendants' argument that their predecessor's purchase free of encumbrances from the last joint owner, the trustee in bankruptcy, is a covenant against any easements by implication. While the word "encumbrances" can have that meaning, it is doubtful whether it was so used in that respect.

Since defendants have the right, even if there were such a servitude or easement, to use first all the water they may require (Heffley v. Lohr, supra, p. 592), and

since an overflow into the pipes leading to plaintiffs' properties is probably to defendants' as well as to plaintiffs' advantage, the parties, in spite of any hard words there may have been between them, should have no difficulty in agreeing upon mutually agreeable terms.

We have adopted both plaintiffs' and defendants' requests for findings of fact, with slight rephrasing in certain instances. For the reasons above given we have rejected plaintiffs' 21st and 22nd requests to find that the servitude was known to defendants and its existence a notorious fact.

Since we have not found the facts upon which plaintiffs' action is based, we have been compelled to reject their requests for conclusions of law.

We have adopted defendants' requests in substance, believing that they are sustained by the evidence upon the vital facts in dispute.

Applying the discussion above to the facts as found, we make the following

*Conclusions of law*

1. The knowledge by two former employes and tenants on a tract of land that a servitude had been created in favor of lower land against upper land does not render such servitude so notorious that a purchaser of the upper land upon severance of title is put upon notice of the existence of the servitude.

2. Under the same circumstances neither the covering of a spring, nor the conveyance of its waters into a lower spring, nor the walling of such lower spring is notice to an intending purchaser that such lower spring serves property other than that of the then owner.

3. Under the same circumstances, where the only evidence of a servitude is the existence of two outlets submerged beneath the surface of the lower spring, an intending purchaser is not put upon notice that such a servitude may or does exist.

4. The court cannot infer from an owner's knowledge of the existence of an easement three or four weeks after acquiring title that he had notice of it prior to acquiring title, in face of his denial under oath of such knowledge or notice.

5. The proper order of the court is to dismiss plaintiffs' bill in equity at plaintiffs' costs.